# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING



FILED

4:17 pm, 12/16/19

U.S. Magistrate Judge

THE UNITED STATES OF AMERICA,

          Plaintiff,

vs.

AMANDA A. ENGLE,

          Defendant.

Case No:5:19-PO-00381-MLC

---

## VERDICT

This Court having considered and evaluated the evidence and legal arguments presented finds:

1. Defendant Amanda A. Engle NOT GUILTY of violating 36 C.F.R. § 2.34(a)(4) in maintaining a hazardous condition as charged in Violation Notice 7137038 as occurring on June 26, 2019 within the boundaries of Yellowstone National Park.

2. Defendant Amanda A. Engle GUILTY of violating 36 C.F.R. § 4.23(a)(1) by operating a motor vehicle while under the influence of drugs as charged in Violation Notice 7137048 as occurring on June 26, 2019 within the boundaries of Yellowstone National Park.

3. Defendant Amanda A. Engle GUILTY of violating 36 C.F.R. § 4.13(a) by stopping or parking on a roadway as charged in Violation Notice 7137049 as occurring on June 26, 2019 within the boundaries of Yellowstone National Park.

**FINDINGS OF FACT**

This matter was tried before the Court on November 8, 2019 with the United States represented by Mr. Francis Leland Pico and the Defendant represented by Mr. Eric T. Oden. The United States presented the testimony of Ranger Arrah M. La Bolle, Drug Recognition Expert and Ranger Nicholas Derene, and Forensic Toxicologist Michelle A. Duffus. Defendant Amanda A. Engle testified as well. Due to the nature of this case it is necessary to set forth a detailed review of the facts regarding all tests which were used with Defendant. The Court finds the following facts:

1. Ranger Arrah M. La Bolle graduated magna cum laude from the University of Idaho, attaining a bachelor's degree in Spanish and International Relations. In 2013 Ranger La Bolle attended the Seasonal Law Enforcement Training Program at Skagit Valley College and became a seasonal law enforcement officer in Yellowstone National Park. She attended the Park Medic Training Academy in 2014 and then returned to Yellowstone National Park. Ranger La Bolle became a permanent ranger at Yellowstone National Park in March 2019.

2. Ranger Nicholas Derene, who testified as a Drug Recognition Expert, attended Embry-Riddle Aeronautical University in Prescott, Arizona and graduated in 2002 with a bachelor's degree summa cum laude in Aerospace Studies. Ranger Derene attended graduate school at the University of Wisconsin in a non-degree conferring program focused on wildlife biology. After working a few wildlife conservation-related jobs, he took a job

operating educational programs with the Yellowstone Association in 2008. In 2011, Ranger Derene attended a law enforcement academy for the National Park Service and has been a commissioned law enforcement ranger at Yellowstone National Park ever since. Ranger Derene is a permanent ranger and attended the Federal Law Enforcement Training Program in Georgia in 2016, focusing on land management police training. Ranger Derene has attended many other training programs focusing on DUI enforcement, obtaining certification in Standardized Field Sobriety Testing ("SFST"), Advanced Roadside Impaired Driving Enforcement ("ARIDE"), Senior Intoxilyzer operations, and as a SFST Instructor. He is also certified as a Drug Recognition Expert ("DRE"), which requires extensive training upfront, continuing education, and recertification every two years. As an officer, Ranger Derene has worked on approximately 120–150 arrests and approximately 500–600 investigations. Ranger Derene has conducted eighty-one evaluations as a DRE. Additionally, Ranger Derene has medical training including studying advanced biology in graduate school and physiology as a pilot, researching behavioral reactions to physical processes in graduate school, and training as a Wilderness First Responder, Emergency Medical Technician ("EMT"), Advanced EMT, and Park Medic.

3. Forensic Toxicologist Michelle A. Duffus earned a Bachelor of Science in Chemistry, with an emphasis in Forensic Chemistry, from the University of Montana in 2009. Ms. Duffus works for the State of Montana Forensic

Science Division, which is also known as the Montana State Crime Lab and has been employed there since 2011. Her current job responsibilities include testing bodily fluids for the presence of drugs and alcohol for the purposes of law enforcement. Ms. Duffus's job title is a Forensic Toxicologist. Ms. Duffus has completed the Montana Law Enforcement Academy's basic Driving Under the Influence ("DUI") Week, the ARIDE course, and the DRE course. She is not a DRE because she is not in law enforcement.

4. Ms. Amanda A. Engle ("Defendant") has been a registered, certified pharmacy technician for twenty-three years. She is also a Type I, insulin-dependent diabetic and has been since she was eighteen years old. Ms. Engle uses an insulin pump. She has also been prescribed alprazolam (Xanax), citalopram/escitalopram (Lexapro), amphetamine (Adderall), hydroxyzine, and mirtazapine (Remeron) for about five or six years.

5. During the trial, the United States of America sought to introduce nine government exhibits, including: (1) body camera video from Ranger La Bolle; (2) additional camera video from Ranger La Bolle; (3) body camera video from Ranger Derene; (4) additional body camera video from Ranger Derene; (5) additional body camera video from Ranger Derene; (6) a body camera exhibit table of contents relating to Exhibits 1–5; and (7) the toxicology report from Amanda A. Engle. All exhibits the government sought to introduce were admitted into evidence without objection.

6. Defendant also sought to introduce one exhibit, labeled as Exhibit A, which was a copy of Ranger Derene's handwritten rolling log. Exhibit A was admitted into evidence without objection.

### Events Leading to Defendant's Traffic Stop

7. On the evening of June 26, 2019, Ranger La Bolle was on patrol in the Old Faithful developed area and encountered the vehicle Defendant was driving on the inbound road to Old Faithful just after exiting the overpass. The vehicle was stopped in the left-hand lane of traffic near the Three Sisters Junction.[1] Ranger La Bolle observed the vehicle stopped for about forty seconds. Two vehicles approached Defendant's vehicle and had to wait behind her vehicle while she was stopped. Ranger La Bolle followed Defendant's vehicle, observing the vehicle drift into the right-hand lane, crossing the white dividing line and staying across the dividing line for about 100 feet before drifting back into the left-hand lane. Defendant's vehicle entered a well-marked crosswalk area and continued into the Old Faithful area at approximately forty miles per hour—five miles above the speed limit. Just before the crosswalk the vehicle braked abruptly before coming to a nearly complete stop and then continuing through the crosswalk. The vehicle continued to weave in its lane. After Ranger La Bolle saw the vehicle drift into the right-hand lane again she turned on her overhead lights. Ranger La

---

[1] The roadway consists of two lanes of traffic entering the Old Faithful developed area.

Bolle approached the driver's window and Defendant stated "what?" in an agitated voice. Ranger La Bolle then asked Defendant to move the vehicle to a parking lot, to which Defendant at first seemed confused about where Ranger La Bolle wished her to go. At that point, Ranger La Bolle believed that it was possible Defendant was impaired, based on the numerous driving behaviors Ranger La Bolle had observed. Further, Defendant's "what" response also indicated to Ranger La Bolle agitation and restlessness, which she noted at trial can also indicate impairment.

8. After Defendant moved her car to the parking area, but failed to pull into a marked parking spot, Ranger La Bolle explained the reason for her stop. Defendant explained that she did not remember stopping in the lane of traffic earlier. Ranger La Bolle noted Defendant's interlock device in the vehicle and returned to her own vehicle to check Defendant's license with her dispatcher.

9. Around the time that Ranger La Bolle was checking Defendant's license, Ranger Derene arrived on the scene, and Ranger La Bolle informed him that they would be performing field sobriety testing. Ranger La Bolle returned to Defendant's vehicle and asked Defendant to come back to her patrol vehicle to have a conversation with her. Even though Ranger La Bolle asked Defendant to sit on the bumper of her patrol vehicle, Defendant stood next to the vehicle. Ranger La Bolle explained Defendant's driving behavior and that she believed she had smelled marijuana in the vehicle. Based on these

behaviors, Ranger La Bolle explained that she wished to conduct field sobriety testing.  Defendant complied.

### Defendant's Performance on Field Sobriety Testing

10. **Horizontal Gaze Nystagmus Test.**  This test is an ARIDE test.  In testimony, Ranger La Bolle explained that nystagmus is involuntary jerking of the eyes and there are many kinds of nystagmus.  In this test, the officer looks for a horizontal jerking of the eye when the eye is traveling horizontally.  Horizontal gaze nystagmus is associated with depressants, inhalants, and dissociative anesthetics.  Lack of horizontal gaze nystagmus is consistent with stimulants. Ranger La Bolle observed an unusual jerking of Defendant's eyes.  Defendant also exhibited head jerk movements.  According to Ranger La Bolle's testimony, these occur when an individual follows the tip of the officer's finger with their head as well as their eyes—even though they are instructed to only do so with their eyes.  Additionally, Defendant interrupted the test.  Ranger La Bolle noted in trial that the inability to focus on the test or complete the test as instructed are both indicators of impairment.  Head jerk movements are a form of divided attention.  Other behaviors range depending on the category of drugs.  Restless or agitated behavior, such as interrupting the test, is another indicator of impairment.

11. **Lack of Convergence Test.**  For the lack of convergence test, the ranger instructs individuals to focus on the tip of the ranger's finger and then circles the finger twice before bringing it in to the individual's nose and holding it

there for about one or two seconds. Convergence refers to an individual's ability to cross their eyes and maintain the cross when the finger is above the nose. If the individual is not able to converge the eyes, it could be due to a natural lack of convergence or a substance, such as a drug, affecting the body's ability to perform that convergence. Lack of convergence is associated with depressants, inhalants, dissociative anesthetics, and cannabis. Ranger La Bolle conducted two passes and observed lack of convergence on both passes. Defendant asked Ranger La Bolle to start the test over again during the second pass and demonstrated head jerk movements during the test.

12. **Walk and Turn Test.** The walk and turn test is a SFST. Ranger La Bolle instructed Defendant on how to perform the test and demonstrated the instructions. Defendant took two heel-to-toe steps along the line, rather than holding the position as Ranger La Bolle instructed. To hold the position, Defendant swayed and raised her arms to maintain balance. She continued to do so after stepping out of the position and being told to resume the position. During the next set of instructions, Defendant interrupted them and, according to Ranger La Bolle's testimony, said something to the effect of "I can't even do this when I'm . . . when I'm . . . ." Ranger La Bolle continued instructions and confirmed that Defendant had no questions. When there were questions, Ranger La Bolle clarified and demonstrated them. Defendant began the test prior to being told to do so, though instructed not to begin until told, took

many steps without touching heel to toe, stopped for additional instructions on how to complete the turn, completed the turn incorrectly, stopped again, and took more steps without touching heel to toe on many of them. Out of the test's eight validated clues, Ranger La Bolle scored Defendant as having missed six. Ranger La Bolle saw a common indicator of impairment in the inability to remember how to correctly complete the turn, inability to remember the instructions after saying she remembered the instructions, and unsteady balance.

13. **One Leg Stand Test.** The one leg stand test is another SFST. In this test, the person is instructed to raise one foot, look at the raised foot, keep their hands at their sides, and to count until told to stop. During the test, Defendant exhibited sway at least two inches from center, leg tremors, stopped the test to ask if it was what Ranger La Bolle was looking for, and stopped before being told to stop. Ranger La Bolle does not score body sway unless it is more than two inches off center. Out of the four validated clues for this test, Ranger La Bolle testified that she scored Defendant as having three clues of impairment out of four. As to the body tremors, Ranger La Bolle observed these in Defendant's legs and noted that this is an indication she is trained to look for in impairment.

14. **Modified Romberg Balance Test.** This test is an ARIDE test. For this test the individual stands with feet together, hands at side, head tilted back and closed eyes. The individual is told to maintain the position for thirty seconds.

Ranger La Bolle testified that she has been trained to consider anything either five seconds below or above thirty seconds to be outside the normal range. In this test, Defendant exhibited body sway and eyelid tremors, and Defendant estimated twenty-nine seconds as thirty seconds. Eyelid tremors can be caused by stimulants and/or cannabis and, according to Ranger La Bolle's training officers, less than one percent of individuals exhibit eyelid tremors naturally.

15. **<u>Finger to Nose Test.</u>** In the finger to nose test, Defendant is instructed to make a closed fist leaving the index fingers extended. The hands stay by the legs until they come up to the nose. There are six passes for this test, three on each side. After the second pass of the test, Ranger La Bolle observed the whites of Defendants eyes and had to instruct Defendant to close her eyes again. Defendant also missed the tip of her nose four times out of six passes.

16. Following these six field sobriety tests, Ranger La Bolle conducted the preliminary breath test and Defendant blew all zeroes.

## <u>Events Following Field Sobriety Testing</u>

17. After field sobriety testing, Ranger La Bolle left Defendant with another officer while a cursory search of Defendant's vehicle was completed. During the search, Ranger La Bolle found prescription bottles—four of which were labeled in Defendant's name and one which was unmarked. The list of medications included Adderall, dextroamphetamine, Lexapro, Xanax, and

Remeron. There were also five children in Defendant's vehicle, all of whom had been there since the time Ranger La Bolle first saw the vehicle.

18. Following the cursory vehicle search, Ranger La Bolle searched Defendant's person and found her insulin pump.

19. After search of Defendant's person, Ranger La Bolle placed Defendant under arrest for DUI. Defendant was then transported to the Old Faithful Ranger Station while two other officers remained with Defendant's vehicle and her children.

20. At the Old Faithful Ranger Station, Ranger La Bolle spoke with Defendant to explain her Miranda rights and ability to consent to the blood draw. Defendant waived Miranda rights and consented to the blood draw.

21. Ranger La Bolle drew Defendant's blood and was the individual who placed the blood into the kit. Ranger La Bolle maintained possession of the blood draw kit while Ranger Derene conducted a DRE drug influence evaluation.

## DRE Drug Influence Evaluation

1. At trial, Ranger Derene testified about the history of DRE training programs, DRE testing, and the accuracy of such tests.

2. The DRE program has been adopted by all fifty states and four countries. It is administered by the National Highway Traffic Safety Administration and the International Association of Chiefs of Police. In the mid-1970s law enforcement and others recognized that DUIs needed taken more seriously and started standardizing impairment tests. In 1978, the SFSTs were created.

In 1979, California officers were noting a lot of DUIs arising from drug-based impairment, so they began to develop a system to detect and prosecute DUIs arising from impairment by non-alcohol substances. The Los Angeles Police Department formalized what is now known as DRE training in order to accomplish these goals.

3. In 1984, researchers at Johns Hopkins University took individuals, blood tested them to ensure they were not under the influence and gave them different medications. The individuals could either receive a placebo, secobarbital, valium (with a low and high dose), dextroamphetamine (with a low and high dose), and marijuana (with a low or high dose of THC). Then, the researchers conducted approximately 320 DRE evaluations. Of the high-dose individuals, ninety-nine percent of the evaluations found they were impaired by a substance, of the low-dose individuals, some of those were classified as impaired and others were not, and ninety-five percent of the placebos were classified as not impaired. About ninety-two percent of those classified as impaired were properly classified as to the type of drug.

4. Another study, the Los Angeles Field Study, evaluated the same process in the field—not in the lab. Out of 173 subjects, only one was determined to be impaired without a finding of substances in their blood. Of those classified as impaired, ninety-two percent were classified as being impaired by the correct category of drug. Ranger Derene noted a variety of other studies further validating different aspects of the DRE program. According to Ranger

Derene, there have been changes to the program over the years, but the level of success has largely remained the same. Further, Ranger Derene testified that he was not aware of any other more recent studies finding biases in the early research, which validated DRE practices.

5. Ranger Derene also testified that the expertise of a DRE is to ask whether impairment exists, whether alcohol can be ruled out as the impairing substance, and whether impairment by medical causes can be ruled out. Although DREs have training in determining what categories of drugs are impairing an individual, that is not the overall purpose of the DRE. Based on the research studies referenced above, on cross-examination Ranger Derene reiterated that it is generally true that DREs are ninety-nine percent or more accurate in that, when they say an individual is impaired, drugs are found in that individual's system.

6. Regarding the required accuracy levels of any given DRE, on cross-examination Ranger Derene explained that each state has a state-wide coordinator who reviews the records from a particular DRE to decide whether the DRE should be certified and recertified. The coordinator may also remove recertification at any time. Ranger Derene is certified through the State of Montana. Ranger Derene testified that ninety-six percent of the times he has concluded an individual was impaired by a drug, toxicology has confirmed that there was a drug in that person's system which could cause impairment.

7. Ranger Derene's DRE drug influence evaluation for Defendant began by collecting basic information about the individual and he noted the time the evaluation began. Then, Ranger Derene conducted the following tests.

8. **Breath Test.** Ranger Derene first repeated the breath test to confirm there was no presence of alcohol in Defendant's system. According to Ranger Derene's testimony, this is because one of a DRE's responsibilities is to determine if there is impairment caused by something other than alcohol, therefore, the DRE must know if there is alcohol in an individual's system at the beginning of the evaluation.

9. **Preliminary Examination.** The preliminary examination is basically a standardized conversation about what an individual has been eating or drinking, including alcohol. One of the reasons for these questions is to assess how individuals are answering questions. Ranger Derene's assessment of Defendant's responses was that she had thick, slurred speech, slow speech, a low tone of voice, and seemed sedated or delayed in her thoughts and reactions to questions. Ranger Derene testified that her behaviors seemed like reactions from someone impaired by alcohol, even though he had not detected alcohol. Next, Ranger Derene asked Defendant to close her eyes and approximate what time it was. Ranger Derene also asked about sleep habits and her physical condition. Defendant was also asked if she was diabetic or epileptic, and she said that she was diabetic. However, when questioned at trial about whether any tests were run regarding potential low blood sugar,

Ranger Derene explained that such tests would have been beyond the regular DRE drug evaluation procedures. Ranger Derene did ask follow-up questions about Defendant's diabetes and she said she had an insulin pump. Defendant said the pump is always delivering insulin to her. Ranger Derene also asked if she was experiencing any symptoms of diabetes and Defendant said no. Ranger Derene testified that Defendant's response to that question was consistent with his own observations. Defendant was also asked about physical defects, the care of a doctor or dentist, and her medications or drugs. Defendant listed the drugs that she uses, including Adderall, Xanax, Lexapro, Atarax, Remeron, ibuprofen, and hydrochlorothiazide. However, Ranger Derene noted that the first five drugs listed were the only ones that were of concern for impairment purposes as they were central nervous system stimulants and depressants. In addition to the general questions asked during the preliminary examination, Ranger Derene took notes on Defendant's general disposition. He noted that Defendant had low levels of energy, as if she was sedated by something, while also acting annoyed. Ranger Derene testified that these two features were counterintuitive, because usually individuals who are annoyed also have higher levels of energy. Ranger Derene also noted that her coordination was slow, she was acting drowsy, and she complained of a dry mouth. Additionally, Defendant's speech was slowed, slurred, low, and raspy. Her breath and appearance of face were not remarkable or out of the ordinary.

10. **Eye Examinations.**  Eye examinations are begun by asking basic questions and evaluating an individual's eyes.  First, Ranger Derene checks for contact lenses or glasses.  Defendant wore contact lenses.  Second, Ranger Derene checks for bloodshot and/or watery eyes.  According to Ranger Derene, this is important because some drugs that DREs are checking for are vasodilators, which will cause a bloodshot eye.  Ranger Derene noted that Defendant had both bloodshot and watery eyes.  Third, Ranger Derene asks if an individual has blindness in either eye and Defendant answered that she did not.  Fourth, Ranger Derene takes a preliminary estimate of an individual's pupil size. A preliminary estimate of Defendant's pupil size showed that hers were noticeably dilated.  After this introduction into the eye examinations, the following tests are conducted.

   a. **Finger to Nose Test.**  For this test, the DRE holds a finger in front of the individual's nose and instructs the individual to track the finger with eyes only—not to move the head.  Ranger Derene testified that he had to remind Defendant several times to open her eyes wider because she had droopy eyes.  Ranger Derene explained in testimony that droopy eyes can be a sign of some of the drugs for which DREs are looking.  Ranger Derene noted that Defendant's eyes tracked equally, but she had trouble watching his fingers, so he would have to remind her to keep looking at the finger.  He noted that inability to focus for long periods of time is not uncommon when a person is

16

having difficulty concentrating and that this can be a sign of drugs in the system.

b. **Equal Pupils.** DREs also check for equal pupils because head trauma can create unequal pupils and cause an individual to look impaired. However, Defendant did not have unequal pupils.

c. **Nystagmus.** There are three types of nystagmus DREs are trained to detect: resting, horizontal gaze, and vertical gaze nystagmus. Horizontal gaze nystagmus is consistent with central nervous system depressants. Ranger Derene noted that the results on Defendant's horizontal gaze nystagmus test were inconclusive because Defendant's eyes were basically moving erratically, rather than showing a very specific type of eye movement. However, during that test, Ranger Derene did rule out vertical gaze nystagmus, even though he did continue to see the vibrations or erratic movement of the eye.

d. **Lack of Convergence.** During the lack of convergence test a DRE moves a finger toward the individual's nose to see if the individual can cross their eyes and keep them crossed. This test can be an indicator of a depressant and cannabis. Defendant exhibited lack of convergence four out of four times. Ranger Derene did testify that some individuals naturally cannot cross their eyes.

11. **Psychomotor/Divided Attention Tests.** After eye examinations, this next series of tests is largely the same as the tests used during an ARIDE or SFST

17

evaluation. The purpose is to assess a person's motor skills and cognitive ability to listen and follow instructions while conducting the requirements of the test. These tests simulate a person who might have to divide their attention while driving a car.

a. **<u>Modified Romberg Balance Test.</u>** The Modified Romberg Balance Test is also part of ARIDE testing. Individuals must tilt their head back, close their eyes, remain in the position for thirty seconds, then pull their head forward and say "stop" when they believe the thirty seconds have concluded. During the Modified Romberg Balance Test, the DRE is looking for body tremors, body sway, and an assessment of the individual's internal clock. The test is examining whether a person can stand still because this indicates a person's sense of equilibrium, which is important to sense feelings in the road while driving. It also analyzes a person's estimate of the passage of thirty seconds because certain drugs can impact individuals' internal clocks. The estimation of thirty seconds is a relative indicator of impairment, meaning, the farther away from thirty seconds an individual is, the more likely that individual is impaired. Tremors during the test can be a sign of what might be acting in a person's system—which could be stimulants or cannabis. Ranger Derene observed Defendant swaying in a figure-eight pattern approximately three inches off-center.

Defendant also exhibited eyelid tremors.  It also took her thirty-three seconds to conduct the test.

b.  **<u>Walk and Turn Test.</u>**  During this test, individuals must put their feet together with their hands by their side and hold that position until they are told to do something else.  For Ranger Derene's tests, he has individuals put their left foot on a tape marked in the shape of an "X" and their right foot on a tape line that heads out from the "X."  Ranger Derene noted that Defendant put her right foot on the X and her left foot in front of her right foot before she must have realized she used opposite feet.  Defendant confirmed that she understood the test, but only touched her heel to toe four out of eighteen steps.  Defendant raised her arms from her sides for the turn in the middle of the test, despite Ranger Derene telling her to keep them down.  Ranger Derene explained that this gave him concern, because it indicated she was either unable to physically complete the test (which seemed unlikely since there were no signs of this being true), unable to understand and remember the instructions, or unable to remember them while physically conducting the test.  As noted in Ranger Derene's testimony, someone having trouble with this test would also be having trouble remembering to complete the steps of driving in traffic, even just the steps required to stop at a stop sign.

c. **<u>One Leg Stand Test.</u>** The one-leg stand test is conducted twice—one time on each foot. For this test the individual puts their feet together with their hands at their sides and stays there until told otherwise. Then, the right foot is picked up about six inches, the legs stay straight, arms stay at sides, and the individual counts out loud until told to stop. Defendant asked for clarification on whether to look down at her foot, Ranger Derene said to do so, but then Defendant did not look at her foot while standing on her left foot until she was told do so at the end of the test. Ranger Derene also testified she exhibited all four standard clues DREs look for in impairment, including swaying throughout the test, raising her arms for balance twice, putting her foot down three times during the test (including hopping before doing so), only counting to eighteen instead of thirty, counting differently than instructed by the DRE, and body tremors. Defendant also acted confused when told to stop the test. Defendant's failure to properly count indicated to Ranger Derene that Defendant's internal clock was slowed down. Ranger Derene testified that the body tremors did not necessarily indicate impairment by themselves, but they were a sign of several drug categories, including stimulants. On the right side, Defendant counted properly, but only counted to seventeen, swayed, put her foot down, used her arms for balance, and exhibited body tremors. Defendant had asked to take her shoes off for the test and

Ranger Derene was able to see the body tremors because he could see the gap between the ball of her foot and the ground fluctuating, which is an indicator of large muscle group tremors as well. Body tremors are classically a sign of stimulants, hallucinogens, or some other dissociative anesthetics.

d. **Finger to Nose Evaluation.** Different than the finger to nose test used in the eye examinations, in this test individuals begin with the eyes closed and head tilted back but are also instructed to make a fist with their hands, extend their pointer fingers, and bring them in front. The DRE will then say "left" or "right," and at that point they bring either their left or right pointer finger up to touch the tip of their finger to the tip of their nose. Defendant touched the tip of her finger to the tip of her nose four times and she missed two times. The test shows an indicator of an individual's sense of themselves, so it is helpful for impairment. A sober person would not miss two times. In a research project from 2016, seventy percent of unimpaired persons could conduct the test without missing at all and about twelve percent only missed once.

12. **Eye Measurements.** During the eye measurements portion of the evaluation, the DRE takes measurements of the size of each pupil, checking the size with a pupilometer twice or more for each eye in three different lighting conditions.

a. **Pupil Measurement in Standard or Room Light.** The first measurement occurs in standard or regular room light, where an unimpaired person should have a pupil size of two and a half to five millimeters. Defendant's pupils measured five and a half millimeters on both eyes. The range is intended to compensate for everyone having a different dilation, but Defendant's pupils were outside this range. Dilation matters because it is an indicator of what may be psychoactive in a person's system, but also because it influences a person's ability to operate their motor vehicle since it regulates the amount of light hitting the retina of the eye. With a person over-dilated like Defendant, they have more light hitting their eye, which could affect someone like Defendant driving in the dark when they get hit by oncoming traffic lights. This can create temporary blinding by light and cause an individual to miss fine details while driving.

b. **Pupil Measurement in Dark Light.** The second measurement occurs with the lights turned out. The lights in the test room are turned out, then the DRE waits one and a half minutes in the room before taking the measurement with a dim pin light covered with the DRE's finger. An unimpaired person should have a dilation between five millimeters to eight and a half millimeters. Defendant was dilated to eight and a half millimeters.

c. **Pupil Measurement in Direct Light.** The third measurement is in direct light. For this measurement, the DRE takes the same pin light used in the second measurement, shines the light in the individual's eyes, and waits fifteen seconds to allow the pupil to adjust. The appropriate range for this is two to four and a half millimeters. Defendant's measurement was difficult to take because her eye fluctuated between five and six millimeters. Ranger Derene accounted for Defendant's high measurement by noting that she was not looking at a particular point for him to take the measurement, even though she was instructed to do so. As the eye moves it will see more or less depending on where it is looking, which is likely why Defendant's measurement was fluctuating.

d. Since Defendant had pupil size dilated above the expected range for room light, dilated at the extreme high end of the range in darkness, and above the expected range in direct light, Ranger Derene concluded she had dilated eyes. Ranger Derene testified that this is generally due to chemical impairment.

e. Additionally, Ranger Derene looks at the eye's reaction to light because some drugs can slow down the reaction to light. It should take an unimpaired person about one second to react to light, but it took Defendant about two seconds—another indicator of impairment. This

also shows what categories of drug she was likely impaired by, which included depressants, inhalants, and stimulants.

13. **Pulse Check.**  DREs take a pulse check at the beginning, middle, and end of a drug evaluation.  The pulse is a relative indication of what is occurring in the physiology of an individual's body.  An unimpaired person should have a pulse between sixty and ninety.  The measurements were eighty-four beats per minute ("BPM"), one hundred BPM, and ninety-four BPM.  Therefore, Defendant's pulse was elevated.

14. **Blood Pressure Check.**  DREs also check blood pressure during a drug evaluation.  An unimpaired person should be 120–140/70–90.  Defendant's blood pressure was 106/70.  Typically, if pulse goes up, blood pressure will remain the same or rise a little.  Therefore, Ranger Derene believed Defendant had "competing interests" in the body (depressants and stimulants) since it is uncommon to have a high pulse with a low blood pressure and multiple interactions were ongoing.

15. **Body Temperature Check.**  There is also a body temperature check with a thermometer.  The normal range is plus or minus one degree of 98.6 degrees. Body temperature can be an indicator of drugs, but it also is helpful as an indicator of systemic infection.  For someone who is sick by illness, but is showing signs of impairment, if they show signs of high body temperature that do not correlate with the category of drug other tests indicate their impairment is from, the temperature might indicate that the person is sick and

impaired by a medical condition only.  Defendant's temperature was below the expected range at 96.2.  Because a low temperature was not an indicator of any medical condition other than hypothermia, which was not evident here, it helped rule out medical conditions as a potential reason for impairment. Ranger Derene testified that, although Defendant's temperature was low, it was not a level that would give him any concern.  In this case, as a Type I diabetic, Ranger Derene testified that Defendant's body temperature generally would have risen if she was experiencing a diabetic emergency, so the temperature did not indicate any type of potential medical emergency occurring.  On cross-examination, Ranger Derene stated that he did not typically observe a severely depressed body temperature unless that person was in a coma or unresponsive for some other condition—not a person with hypoglycemia still walking around.  Ranger Derene also testified that there are drugs that can cause a decrease in body temperature, including primarily narcotics.  Ranger Derene stated Defendant showed some signs of a person who is on narcotics, but that he did not conclude she was affected by narcotics because she did not exhibit all those signs.

16. **Muscle Tone Check.**  DREs also check an individual's arms for muscle tone since some drugs cause rigidity in the muscles while others cause flaccidity. Defendant's muscle tone was normal.

17. **Interview.**  At the end of the drug evaluation, the DRE has an interview with the individual.  This gives the individual an opportunity to explain what drugs

or medications they are using. Defendant appeared to be honest at the beginning and end of the evaluation and repeated the same medications both times. The DRE also asks medication doses, whether the individual understands what is happening, and how the individual felt about the tests. Defendant had already explained doses. She also indicated she did not feel very well about the tests. Defendant tried to explain why she felt like she had done poorly on the one leg stand test, including that she was looking at Ranger Derene. Ranger Derene testified that he explained to her how looking at him would make the test easier, which is why individuals are not supposed to do so. He also asked her during this interview how she could explain putting her foot down three times during the test and she said she had no explanation other than she was thinking about her children. Ranger Derene further asked if she understood the warnings on her medications, since she was a pharmacy technician. Defendant said she did understand that all her medications warned of potentially making the user an unsafe driver. Therefore, Ranger Derene questioned Defendant about why she was driving on the medications. Defendant indicated that, while other people are affected by the medications, she was taking them as prescribed and was not affected by them. However, she also said she understood that taking prescriptions, even legally as prescribed, could impair a driver. Nevertheless, she said she felt like she was not impaired.

18. **Evaluation Conclusion.**  At the end of the drug evaluation, Ranger Derene determined that Defendant was impaired—not due to alcohol or medical causes—and she was incapable of safely operating a motor vehicle.  Ranger Derene saw indicators of central nervous system depressants and stimulants in her system to a degree that would render her incapable of safe operation. Throughout the tests, Ranger Derene noticed a mix of indicators that would result from taking a depressant and stimulants at the same time—just as Defendant told him she was doing.  He testified that often depressants and stimulants can balance out in drug evaluation tests.  For example, estimating near thirty seconds in the Modified Romberg Balance Test can indicate that an individual is either not impaired or is taking a balance of depressants and stimulants.  Additionally, the elevated pulse indicates a stimulant while low blood pressure is a depressant indicator, which would explain the unusual combination of elevated pulse and low blood pressure that Defendant displayed.  Overall, Defendant's body displayed competing these interests.

**Events Following DRE Drug Influence Evaluation**

19. After Ranger Derene's evaluation was complete, Ranger La Bolle placed the face sheet from Ranger Derene's evaluation into the blood draw kit and sealed the kit.  The blood draw kit's seal is tamper-resistant.  Ranger La Bolle maintained possession of the blood draw kit until she later mailed the kit to the Montana State Crime Lab.  Ranger La Bolle testified that there was no

refrigerated area available for the blood draw kit, but that the anticoagulant makes refrigeration unnecessary.

20. After completing the drug influence evaluation, Defendant was released with a court date and the rangers arranged for Defendant and her family to stay in Old Faithful Inn for the night.

### Testimony Regarding Diabetic Symptoms

21. During testimony, Ranger La Bolle noted that she was trained to recognize low blood sugar during ARIDE training. Ranger La Bolle explained that blood sugar can fall to "amazingly low" levels without showing any symptoms, but that symptoms of a low blood sugar emergency can include slow or slurred speech, unsteady balance, cold clammy skin, weak pulse, confusion, and irritability. Ranger La Bolle performs blood sugar evaluations on any person showing a severely altered level of consciousness. Additionally, if a person tells her they are diabetic during a medical evaluation then Ranger La Bolle will also conduct a blood sugar evaluation. Ranger La Bolle did not know Defendant was diabetic until she felt the insulin pump because asking about medical conditions is not a part of the formal ARIDE process. However, Ranger La Bolle noted that, while some diabetic symptoms overlap with impairment, other indicators she had observed did not arise out of a simple medical reason. The lack of memory, inability to divide attention, muscle tremors, and eyelid tremors were not indicators Ranger La Bolle had been trained to recognize as results of low blood sugar. Ranger La

Bolle also noted that whenever she has previously observed a person in a diabetic emergency, they told her about it unless they were so altered they could not function.

22. Ranger Derene also testified that DREs are trained to be specifically aware that certain medical conditions can mimic the effects of drug or alcohol impairment. Conditions that DREs must remain cognizant of include hypothermia or diabetes. Ranger Derene confirmed that low blood sugar may cause an individual to exhibit low-energy behavior and sluggishness and may later cause low body temperature. However, the low body temperature usually comes late in the medical emergency, typically around the time when an individual is unable to communicate. Other later signs of low blood sugar may include decreased blood pressure, flushed pale skin, skin cool to the touch, increased pulse, and lack of coordination. Ranger Derene answered during cross-examination that he thought it was possible that low blood sugar could cause body tremors, but he had not seen that himself. Ranger Derene reiterated that he could not recall seeing these later signs when a person was still upright and communicative. Since some of these symptoms could show as signs of impairment, that is the reason Ranger Derene asked Defendant if she was feeling any symptoms of diabetes or an emergency. He also testified that, in his experience as a medic, he had never encountered an individual experiencing a low blood sugar emergency who did not explain their symptoms to him. Ranger Derene went further to say that, in his experience,

he had never encountered an individual who did not tell him when they were experiencing a problem with diabetes, let alone explicitly deny having problems with diabetes. Defendant told Ranger Derene that she was experiencing no signs of a low blood sugar emergency. Ranger Derene testified that her statement was consistent with his own observations and conclusion.

### Forensic Toxicologist Testimony

23. Forensic Toxicologist Michelle Duffus testified at trial regarding Defendant's blood testing at the lab. Ms. Duffus was involved with testing Defendant's blood. The sample was taken on June 26, 2019, but not received at the lab until July 10, 2019. The submission indicated that the kit came from Ranger La Bolle. Because the kit came through the United States Postal Service, Ms. Duffus stated that the blood sample was not refrigerated as it came through the mail.

24. As to the age of a blood sample, Ms. Duffus stated she was not aware of any rule that prevents testing a blood sample if it is too old. No matter the age, the crime lab would analyze it as normal.

25. Ms. Duffus also testified that it is best practice to refrigerate blood samples, but numerous studies show it is not required. Ms. Duffus testified that it is not unusual for law enforcement officers to leave blood kits in their vehicles. Additionally, Ms. Duffus testified that some drugs break down in a person's system, so the level of concentration in a person's blood may decrease the

longer the blood sits out of refrigeration, which is why refrigeration is important.

26. Ms. Duffus testified briefly as to the procedures followed when her lab receives a new blood kit. Prior to testing, the lab ensures that the kit is sealed properly and that nothing happened to the kit in transit. If there is a secure chain of custody, the kit can proceed to a toxicology technician who specifically looks at the kit's tubes to make sure they have a seal on them. Ms. Duffus testified there was nothing unusual about Defendant's kit, the seals were intact. Ms. Duffus was involved in the analysis of Defendant's blood in addition to three other toxicologists. When testing the blood, it depends on the case as to how much information the lab receives about the individual's blood. The face sheet can help provide information for the test. However, the lab will usually test for other drugs beyond just those referenced in the face sheet. The lab will test for different classes of drugs in a preliminary screen. Ultimately, the testing resulted in several conclusions about what was in Defendant's blood and produced a toxicology report for Defendant.

27. The following information came from Defendant's toxicology report and Ms. Duffus's testimony:

a. The first substance on the report was alprazolam, a central nervous system depressant. This substance was detected at less than 0.02 milligrams/liter ("MG/L"). According to Ms. Duffus's testimony, this

means that alprazolam was in the system, but the lab's regulations and curves only go down to 0.02 MG/L. Thus, even though alprazolam was in Defendant's system, there was no particular number that came from the calibration curve.

b. The second substance was citalopram or escitalopram, which is a central nervous system depressant. This substance was not quantitated, only detected, because by itself it is not typically impairing. The potential for impairment can arise when this drug is added to other drugs in the system. Consequently, according to Montana State Crime lab policy, the number is not quantitated in reports.

c. The third substance was amphetamine, which was only detected in Defendant's system. The reason here for only detection is because there was not enough blood sample for the lab to quantitate the amount of amphetamine in the system.

d. The fourth substance was hydroxyzine, another central nervous system depressant, which was detected at 0.076 MG/L.

e. The fifth substance was mirtazapine, which was detected at less than 0.020 MG/L. The exact concentration was not calculated because it was below the cutoff levels of the lab's calibration.

f. Ms. Duffus testified that the tests determined these five drugs were in Defendant's blood, but two were found in such small quantities that they were below the limit of quantitation.

28. According to Ms. Duffus, there are various ranges of drugs that toxicologists look at including therapeutic, toxic, and lethal ranges. Ms. Duffus testified that an individual in the therapeutic range is taking medications as prescribed by a doctor. The toxic range is typically more associated with DUI cases, and the lethal range is usually associated with deaths. With respect to Ranger Derene's testimony relating to the effects of central nervous system depressants or stimulants on the body, Ms. Duffus testified that Ranger Derene characterized those symptoms accurately.

29. During testimony, Ranger Derene explained that a toxicology report alone cannot indicate that an individual is impaired. The fact that drugs are in a person's system does not necessarily mean they were impaired. Ms. Duffus supported Ranger Derene's testimony in that regard, testifying that impairment cannot be determined only by a toxicology report, but that the opinions of law enforcement officers on scene must be considered in determining impairment. However, Ms. Duffus did confirm that Ranger Derene's opinions were consistent with the chemicals she found in the blood testing.

**Defendant's Testimony**

30. At trial, Defendant testified regarding her diabetes.  She reiterated that she uses an insulin pump to control her blood sugar levels and stated that she checks her blood sugar levels about three times per day.  When her blood sugar elevates, Defendant testified that she gets chest pain, dry mouth, confused, tired, and she throws up.  When her blood sugar becomes low, she gets dry mouth, a weird taste in her mouth, sweaty, confused, scared, nervous, irritable, and she starts shaking.  Defendant also testified to a time when she had a diabetic emergency and called 911.  However, Defendant further testified that she experiences symptoms of low blood sugar prior to such an emergency.  Defendant testified that, while taking the drug influence evaluation, she was cold, her mouth was dry, she was confused, she was thirsty, and she was having symptoms she associates with low blood sugar.  Defendant testified that she did not tell Ranger Derene how she was feeling because typically, as a diabetic, "the answer is no."

31. As to the events of the night in question, Defendant testified that she was confused about why she was pulled over.  Defendant admitted that she did stop at the pedestrian crosswalk, she also stopped apparently to scold her children while they were fighting in the back seat.  Defendant also mentioned that she was blowing into an intoxilyzer while driving and attempting to take pictures.

**CONCLUSIONS OF LAW**

The government has a burden to prove "beyond a reasonable doubt" the essential elements of this case. *In re Winship*, 397 U.S. 358, 361 (1970).

## Violation Number 7137038

As to Violation Number 7137038, Defendant was charged with violating 36 C.F.R. § 2.34(a)(4) which reads: "(a) A person commits disorderly conduct when, with intent to cause public alarm, nuisance, jeopardy or violence, or knowingly or recklessly creating a risk thereof, such person commits any of the following prohibited acts: . . . (4) Creates or maintains a hazardous or physically offensive condition." 36 C.F.R. § 2.34(a)(4) (2019).

Nothing in the evidence indicates that Defendant had intent to cause public alarm, nuisance, jeopardy or violence by creating or maintaining a hazardous or physically offensive condition. Moreover, there is no evidence to indicate that Defendant knowingly created or maintained a hazardous or physically offensive condition. Indeed, Defendant was vacationing with her family and testified at her confusion as to why she was pulled over. It seems likely that anyone with such intent or knowledge would not have responded to the situation with confusion as Defendant did. Defendant's testimony emphasizes her concern over her children's welfare and casts reasonable doubt on whether she knowingly created or maintained a hazardous or physically offensive condition for the well-being of her children.

It is necessary, however, to determine whether defendant recklessly created a risk of public alarm, nuisance, jeopardy or violence by creating or maintaining a hazardous or physically offensive condition. Courts have defined reckless under 36 C.F.R. § 2.34(a) as deliberately disregarding "a substantial and unjustifiable risk." *United States v.*

*Coutchavlis*, 260 F.3d 1149, 1155 (9th Cir. 2001) (quoting *United States v. Albers*, 226 F.3d 989, 995 (9th Cir. 2000); *see also Albers*, 226 F.3d at 995 (noting that the Supreme Court has also explained "a finding of recklessness" is only permitted "when persons disregard a risk of harm of which they are aware"). The inspiration for this definition of reckless is drawn from the Model Penal Code. *Id.* (citing Model Penal Code § 2.02(2)(c) (1985)).

Considering the facts in this case, Defendant did evince that she was aware her medications could impair her driving, but that she had been using them for five to six years and had never noticed a problem. There is not enough evidence to conclude that she consciously disregarded a substantial and unjustifiable risk by taking these medications and proceeding to drive under their influence. Some prescription medications have no impact on a person's ability to drive unimpaired. Likely there are individuals who can take the same medications as Defendant and drive unimpaired. Therefore, because Defendant did not necessarily consciously disregard a *substantial and unjustifiable* risk to the extent needed to constitute recklessness, the Court finds Defendant NOT GUILTY of disorderly conduct.

## **Violation Number 7137048**

Regarding Violation Number 7137048, Defendant is charged with violating 36 C.F.R. § 4.23(a)(1), which reads: "(a) Operating or being in actual physical control of a motor vehicle is prohibited while: (1) Under the influence of alcohol, or a drug, or drugs, or any combination thereof, to a degree that renders the operator incapable of safe operation." 36 C.F.R. § 4.23(a)(1) (2019). Persuasive authority sets out that, under this

regulation, the government should bear a burden to prove: "(1) Defendant was operating or was in actual physical control of a vehicle, (2) that Defendant was under the influence of alcohol, or a drug, or drugs, or any combination thereof, and (3) to a degree of intoxication that rendered Defendant incapable of safe operation." *United States v. Davis*, 261 F. Supp. 2d 343, 347 (D. Md. 2003). There is no question that Defendant was operating the vehicle in question and was in actual physical control of the vehicle, therefore, the first element is not at issue.

As for the second element, the government must prove that Defendant was under the influence of a substance and must prove what the substance was at the time of the conduct in question. *Id.* Chemical blood analysis can be used for this element. *See id.* In *United States v. Davis*, the court refused to rely on chemical blood analysis alone where the presence of marijuana was detected at only an unspecified concentration. It is important to note, however, that *Davis* is only persuasive authority for this Court in deciding whether the elements of 36 C.F.R. § 4.23(a)(1) are met. Moreover, the case before this Court is distinguishable from *Davis*.

In the present case, the chemical blood analysis showed levels of alprazolam, citalopram/escitalopram, amphetamine, hydroxyzine, and mirtazapine in Defendant's blood. The analysis simply confirmed what Defendant had indicated she was consuming and the findings of Ranger Derene. The combined testimony of Ranger Derene and Defendant in addition to the lab results establish that Defendant was under the influence of drugs. The remaining and critical issue is the degree to which Defendant was under the influence of drugs. Considering the evidence in total, the Court finds the government has

proven beyond reasonable doubt that Defendant was driving under the influence of drugs. Thus, the Court finds the second element of this offense satisfied and will now proceed to analyze whether Defendant was driving under the influence of drugs to a degree rendering her incapable of safe operation.

Turning to the third element, the government must also prove that the amount of drug or drugs in Defendant's system affected Defendant to a degree rendering her incapable of safe operation. *Id.* It is important for the government to rule out other explanations for the symptoms they attribute to driving under the influence of drugs, such as alcohol or medical conditions. *See id.* at 348 (explaining that the testifying officer noted the defendant was disoriented and catatonic but did not effectively rule out the possibility that such occurrences were not due to a medical condition). Other courts have determined that DREs offer an appropriate form of testimony to rule out alcohol or medical causes as the source for a defendant's driving patterns. *See generally United States v. Everett*, 972 F. Supp. 1313 (D. Nev. 1997) (evaluating numerous other courts' treatment of DRE testimony before concluding that DRE evidence is admissible as expert testimony). Just as one purpose of physicians can be to eliminate other potential causes for physical manifestations, such as indications of drug impairment, a DRE can serve the same purpose. *Id.* at 1322.

Regarding the admissibility of DRE testimony as expert testimony, Rule 702 of the Federal Rules of Evidence states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Of course, the uncodified *Daubert* requirement for courts to act as a "gatekeeper" of expert testimony also applies to the testimony of DREs. *See Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1174 (1999).[2] However, the question of whether DRE testimony must be evaluated under the *Daubert* factors for *scientific* expert testimony is less clear. *See Everett,* 972 F. Supp. at 1319.[3] The Court's research in this respect reveals no precedent in the District of Wyoming or the Tenth Circuit on the matter, thus, the Court shall draw on persuasive authority. Although the observations of a DRE are long-established and used in the medical community, they are not necessarily "scientific" in nature, but are rather based on "observation, training and experience." *Id.* at 1321. Thus, courts have concluded that the *Daubert* factors for scientific expert testimony are not applicable to testimony based on other, non-scientific specialized knowledge, including DRE testimony. *Id.*; *United States v. Gonzales*, No. CR 09–1786–TUC–CKJ, 2010 WL 5392644, at *4 (D. Ariz. Dec. 28, 2010); *see also United States v. Fields*, No. 5:08–CR–395–FL–1, 2009 WL 3029726, at *8–9 (E.D.N.C. Sept. 21, 2009) (classifying the

---

[2] Defendant did not challenge Ranger Derene's testimony specifically pursuant to *Daubert*.
[3] Such factors include: (1) "whether the theory or technique employed by the expert is generally accepted in the scientific community"; (2) "whether it's been subjected to peer review and publication"; (3) "whether it has been tested"; and (4) "whether the known or potential rate of error is acceptable." *Everett*, 972 F. Supp. 2d at 1319.

testimony of a DRE as expert evidence without even analyzing *Daubert*). This Court, too, declines to apply the *Daubert* factors for scientific expert testimony to DRE testimony.

Declining to apply the *Daubert* factors for scientific expert testimony, yet still operating as the "gatekeeper" of expert testimony, the Court will treat the testimony of Ranger Derene, in his capacity as a DRE, as expert testimony. Ranger Derene testified to the technical and specialized knowledge of DREs, detailing the vast extent of their training, and his testimony obviously evidences how his knowledge could assist the trier of fact in determining the extent of Defendant's impairment. Additionally, Ranger Derene's testimony was based on many observations from his evaluation of Defendant's ability to drive. Moreover, the tests Ranger Derene used during his evaluation have been verified as accurate by decades of research. Further still, Ms. Duffus—who has also received DRE training—verified after hearing Ranger Derene's testimony that his findings were consistent with the chemicals she found in Defendant's blood sample. Defendant did not provide any testimony or evidence refuting the reliability of DRE examinations for the determination of impairment. These findings indicate that it is appropriate to admit Ranger Derene's testimony as expert testimony under Rule 702.

The Court now proceeds to apply Ranger Derene's testimony to this case to determine whether Defendant was incapable of safe operation. The breath test Ranger Derene performed first specifically ruled out alcohol as the cause of Defendant's abnormal driving. Thus, the rest of Ranger Derene's observations were conducted to determine whether it was drugs or medical conditions causing Defendant's abnormal and unsafe driving.

Ranger Derene's questions prior to the eye examinations ruled out any eye conditions, and then the eye examinations Ranger Derene performed presented factors that DREs attribute to drug impairment, including lack of convergence and erratic movement of the eye. Moreover, during the finger to nose test, Defendant had difficulty completing the test, which indicated to Ranger Derene that she would also have difficulty concentrating while driving.

In the divided attention tests, Ranger Derene observed more factors contributing to his opinion that Defendant was driving under the influence of drugs, including inability to remember instructions, inability to follow directions, inability to keep balanced, inability to properly complete the tests, alteration of Defendant's internal clock, body sway, and body tremors. These observations not only indicated to Ranger Derene that Defendant was under the influence of drugs, but they also indicated that she was incapable of safe operation. For example, body sway that Ranger Derene observed during the Modified Romberg Balance Test would indicate that Defendant did not have a good sense of herself and would also not have a good sense of the road while driving. Failing at touching her finger to nose twice was also an indicator that she had a poor sense of herself, which would impact her sense of the road. Additionally, an individual who cannot properly complete these tests would also have difficulty driving safely in traffic, which requires attention and obedience to traffic laws.

The eye measurements Ranger Derene performed showing overly-dilated pupils indicated that Defendant was under the influence of drugs and chemically impaired. Not only are over-dilation and slowed eye reactions a sign of drugs in an individual's system,

but they also indicate that an individual would have difficulty driving. This is due to the temporary blindness that results from bright headlights hitting overly-dilated pupils that are reacting slowly to light.

Other tests, such as the pulse check, blood pressure check, and body temperature check all indicated to Ranger Derene that Defendant was under the influence of drugs, which was confirmed by the toxicology report. As an officer with extensive medical training, Ranger Derene saw no indication that any of these previously-mentioned factors were caused by medical conditions.

Although Defendant attempts to argue that her diabetic symptoms were the cause of her consistent failure on the field sobriety testing and the drug influence evaluation tests, she does not present evidence to create a reasonable doubt that it was drugs which caused her impairment and inability to operate a motor vehicle safely. Defendant was using an insulin pump designed to ensure she was not suffering from low blood sugar. Additionally, Ranger Derene testified that any drug impairment indicators he and Ranger La Bolle observed which overlap with low blood sugar emergency symptoms were symptoms that occur late in an emergency—when an individual is unresponsive. Defendant was always responsive. Moreover, Defendant did not mention any symptoms to Ranger La Bolle and specifically stated to Ranger Derene that she was not experiencing any diabetic symptoms. This statement was consistent with what Ranger La Bolle and Ranger Derene, both medically trained, observed to be true and testified to at trial. In addition, Ranger Derene's expert testimony concluded that Defendant was not suffering from diabetic symptoms and Defendant offered no expert testimony to contradict that testimony. Defendant's testimony

as to why she did not disclose diabetic symptoms upon questioning by Ranger Derene was not credible.  Further still, the Court was able to observe Defendant at trial and as she appeared in the body camera videos introduced into evidence.  Those observations support this Court's decision regarding impairment.

The government has produced evidence establishing beyond a reasonable doubt that it was drugs, not alcohol or a medical condition, that caused Defendant's observed driving behaviors.  Moreover, the testimony from Ranger La Bolle regarding Defendant's driving habits, combined with the unrefuted expert opinion from Ranger Derene that Defendant was incapable of operating her vehicle in a safe manner due to the presence of drugs in her body, have established that the third element is satisfied.  The Court recognizes that there are potential innocent explanations for Plaintiff's improper driving and poor test performance, but when all of the facts are considered together the Court is convinced that the government has established its case beyond a reasonable doubt.   For these reasons, the Court finds Defendant is GUILTY of Violation Number 7137048.

## **Violation Number 7137049**

Lastly, as pertains to Violation Number 7137049, Defendant is charged with violating 36 C.F.R. § 4.13(a), which prohibits "[s]topping or parking a vehicle upon a park road, except as authorized by the superintendent, or in the event of an accident or other condition beyond the control of the operator."  In the present case, Ranger La Bolle testified that she saw Defendant stopped in the road to the extent that other cars were required to stop or divert around her.  Moreover, Defendant admitted to having stopped in the roadway

during her own testimony.  Therefore, the government has proven beyond a reasonable doubt that Defendant is GUILTY of violating 36 C.F.R. § 4.13(a).

**IT IS THEREFORE ORDERED** that the Court finds Defendant:

1. NOT GUILTY of violating 36 C.F.R. § 2.34(a)(4);

2. GUILTY of violating 36 C.F.R. § 4.23(a)(1); and

3. GUILTY of violating 36 C.F.R. § 4.13(a).


Dated this 16th day of December, 2019.

_____

MARK L. CARMAN
UNITED STATES MAGISTRATE JUDGE